UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

KERRY D. MILLER,

                    Petitioner,                  Case No. 1:12-cv-925

v.                                           Honorable Robert Holmes Bell

JOHN PRELESNIK,

                    Respondent.

_____/

## OPINION

       This is a habeas corpus proceeding brought *pro se* by a state prisoner pursuant to 28 U.S.C. § 2254.   On June 24, 2009, a Kent County Circuit Court jury found Petitioner guilty of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b(1)(f) and unlawful imprisonment, MICH. COMP. LAWS § 750.349b.

       Petitioner's convictions stem from his actions on August 13, 2008.  The Michigan Court of Appeals summarized the events giving rise to Petitioner's criminal convictions as follows:

> The complaining witness testified that she had been on friendly terms with defendant for several years, and had on some occasions taken his money in exchange for sexual favors.   According to complainant, on the occasion in question she accepted defendant's offer of $75 in exchange for his tying her up, but this agreement did not include physical violence against her.  After she disrobed, defendant duct-taped her mouth and put her in restraints, then beat her buttocks with a belt "several times," "slugged" her "hard in the mouth," and penetrated her vagina with his penis before ejaculating on her chest. Complainant testified that defendant also produced a gun and told her he would kill her if she told anyone of the incident.   According to complainant, defendant then forced her into his vehicle and drove her some distance away and threatened to abandon her.   Defendant eventually drove her home after receiving her assurance that she would not tell of the incident . . . .

(Mich. Ct. App. (MCOA) Op. at 1, ECF No. 26.)

On July 16, 2009, Petitioner was sentenced as an habitual offender, fourth felony offense, to concurrent prison terms of 30 to 40 years' imprisonment on his CSC I conviction and 15 to 30 years' imprisonment for unlawful imprisonment.  (Cir. Ct. Register of Actions, ECF No. 17; J. of Sentence (ECF No. 26.)

After unsuccessful attempts to overturn his conviction in state court, Petitioner filed this habeas corpus petition.  Petitioner seeks federal habeas corpus relief on the following grounds:

I.   The trial court violated petitioner's right to self-representation by denying his motion to represent himself without holding the required *Anderson* hearing. The trial judge told petitioner he had no right to help with his defense.

II.  The trial court abused its discretion by allowing Mich. Rules of Evidence 404(b) other acts evidence into the record.  Appellate counsel was ineffective for failing to raise the issue of false allegations made by the prosecution to introduce this evidence.

III. The search warrant has the wrong address and the wrong description of the residence and false allegations were made to obtain a search warrant.

IV.  Petitioner was denied the effective assistance of both trial and appellate counsel.

(Pet., 3-5, ECF No. 1, PageID.3-5; Pet'r's Br. at iv, ECF No. 1, PageID.11.)  Respondent argues that the petition should be denied for lack of merit, because Petitioner has not shown that the decision of the Michigan Court of Appeals rejecting petitioner's claims was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Respondent also argues that Ground II raises a state-law claim that cannot provide a basis for relief under 28 U.S.C. § 2254(a) and Ground III is barred by *Stone v. Powell*, 428 U.S. 465 (1976).  (Answer at 2-4, ECF No. 15, PageID.313-15.)

Upon review, the Court concludes that petitioner has not established grounds for federal habeas corpus relief.  As a consequence, the Court denies the petition.

### Procedural and Factual Background

On September 24, 2008, Petitioner received a preliminary examination in Kent County District Court.  At the conclusion of the preliminary examination, the district court judge found probable cause and bound Petitioner over for trial on the CSC-I and unlawful-imprisonment charges.  (ECF No. 18.)

On January 5, 2009, the Kent County Circuit Court granted a motion by Petitioner's original appointed counsel to withdraw, and he appointed Attorney Jeffrey Kortes.  (ECF No. 17.) Petitioner's attorney filed a motion in limine on February 27, 2009, seeking to preclude expert testimony from Gerald McCarthy and Linda Rossman and to bar introduction of Petitioner's prior conviction under Rule 404(b) of the Michigan Rules of Evidence.  On March 27, 2009, the Court conducted a hearing on a motion filed by Petitioner's attorney, seeking dismissal on the basis of a purported speedy trial violation.   (Mot. Tr. (MT), ECF No. 21.)  The trial court denied the motion to dismiss because "the delay was occasioned by the change of counsel[.]  " (MT, 8.)

On May 1, 2009, the court scheduled Petitioner's trial to begin on June 22, 2009. (ECF No. 17.)  On June 9, 2009, Petitioner filed two *pro se* motions:  one was a motion for leave to appeal the denial of the motion to dismiss, and the other was Petitioner's "Motion for Defendant to Represent Himself in these Matters." (*Id.* at 5.)  In the motion to represent himself, Petitioner stated that his attorney had "failed at every stage since January 5, 2009[.]" (*See* Br. in Supp. of Mot., ECF No. 30.)  He complained that he had been requesting discovery and that his attorney had failed to respond.  (*Id.*)  In his brief, Petitioner again expressed dissatisfaction with his attorney's failure to

respond to his discovery requests and complained that his attorney had not filed an appeal of the decision denying the motion to dismiss.  On June 10, 2009, the court entered orders denying the motions because the right to self-representation and the right to counsel were mutually exclusive, and Petitioner was represented by counsel.  (6/30/09 Cir. Ct. Order, ECF No. 30.)

Petitioner's trial began on June 22, 2009, and concluded with the jury's verdict on June 24, 2009, finding Petitioner guilty of first degree criminal sexual conduct and unlawful imprisonment.  (Trial Transcripts (TT I-TT III),[1] ECF No. 22-25.)  On June 22, 2009, the trial judge heard argument on several motions before jury selection began.  (TT I, 3-16, ECF No. 22.)  Among other things, the trial court found that the evidence regarding a prior incident of criminal sexual conduct by Petitioner was admissible under Rule 404(b) of the Michigan Rules of Evidence as showing plan, scheme or design.  (TT I, 15.)  The court also denied Petitioner's attorney's motion to exclude testimony from Gerald McCarthy and Linda Rossman.  (TT I, 13-14.)

The key testimony in this case was provided by Mary Buzzitta.  She testified regarding her own actions on August 13, 2008 and those of Petitioner.  Ms. Buzzitta knew Petitioner and identified him in court.  (TT II, 50-51.)  They had a relationship in which she would travel a few blocks down the street to Petitioner's residence and have sex with him in exchange for money a couple of times per month.  (TT II, 51-52.)  Petitioner contacted her on the morning of August 13, 2008, and asked her to come over and have sex.  According to Ms. Buzzitta, her long-term boyfriend Leroy Cobb knew that she engaged in sex for money and that she went to Petitioner's residence to have sex in exchange for cash.  Ms. Buzzitta testified that on August 13, 2008, Petitioner asked her not to let Leroy know that she was coming over.  (TT II, 54-56.)

---

[1]The transcript for the third day of trial is divided into two parts.  (ECF 24 and 25.)

Ms. Buzzitta walked to Petitioner's apartment.  She testified that Petitioner offered her $75 if she agreed to be tied up or $10 for a different sexual act.  She accepted Petitioner's offer of $75 in exchange for tying her up, but the agreement did not include physical violence against her.  (TT II, 56.)  They went to Petitioner's bedroom.  She took off her clothes and allowed Petitioner to tie her hands behind her back with plastic ties.  Petitioner put duct tape over her mouth and chained her to the bed.  Petitioner then beat her buttocks several times with a belt.  He slugged her very hard in the mouth.  He penetrated her vagina with his penis before ejaculating on her chest.  (TT II, 57-59.) Petitioner got a handgun out of a drawer in the bedroom and informed Ms. Buzzitta that they were going for a ride.  She was permitted to put on her clothes other than her bra, and then her hands were once again bound behind her back.  During the drive, Petitioner indicated that he had a body bag with her name on it.  Petitioner drove her to a dead-end street not far from the Clarksville exit off the highway.  Petitioner indicated that she was not the only woman he had done this to and that if she screamed, she would be dead.  After Ms. Buzzitta promised not to contact the authorities, Petitioner drove her back to his apartment and she walked home from there.  (TT II, 59-60, 73-74.)

Ms. Buzzitta testified regarding the injuries that she suffered.  The jury saw the photographs taken of Ms. Buzzitta's physical injuries.  (TT II, 64-68, 88-91.)  Nurse Examiner Linda Rossman testified that Ms. Buzzitta's injuries were consistent with being whipped by a belt.  (TT III, 9-12.)

Petitioner's attorney cross-examined Ms. Buzzitta on the basis of her preliminary examination testimony and statements that she gave to the police.  (TT II, 73-77.)  Defense counsel was able to elicit testimony from Ms. Buzzitta in which she committed herself to a time frame of approximately three and one-half hours from the time of her arrival at Petitioner's apartment to her return to that apartment after Petitioner drove her to the Clarksville exit.  (TT II, 78.)  He also elicited

testimony that it took five minutes or less to walk the distance from Petitioner's apartment to her residence.  (TT II, 82.)  In addition, Petitioner's attorney elicited testimony from Ms. Buzzitta that she was not paid the $75 on the date of the sex act.  (TT II, 80.)

Linda Rossman, the manager of the YWCA nurse-examiner program, testified as an expert in the filed of injuries sustained in sexual assault.  (TT III, 7-8.)  Rossman did not examine Ms. Buzzitta, but she reviewed the photographs taken of Ms. Buzzitta's injuries and concluded that the bruises were consistent with injuries caused by the striking with significant force by a strap, belt or other oblong object, and that the injuries were consistent with having been inflicted within 24 hours of the picture-taking.  (TT III, 9-10.)  The bruises could, however, have been made within a time frame of one to four days.  (TT III, 12.)

Leroy Cobb testified that he saw that Ms. Buzzitta had a big welt across the back of her leg.  Cobb said that he could see that she had been beaten pretty hard with something.  He convinced Buzzitta that she had to call the police.  She called 911.  They met with a police officer.  Cobb asked the officer if he was going to arrest Petitioner, and he was not satisfied with a response to the effect that he did not even know if a crime had been committed.  Cobb indicated that he made calls to Petitioner because he was upset at the situation, not to demand payment from Petitioner.  (TT III, 33-37, 43.)

Detective Daniel Adams testified that the dispatch computer indicated that the 911 call was received at 11:44 a.m. on August 13, 2008.  (TT II, 107.)  Officer Chad Kooyer testified that he was dispatched at 11:51 a.m. and met Ms Buzzitta in a parking lot near Ralph's Market at approximately noon.  He took a statement from Ms. Buzzitta  (TT I, 37-38.) .  Officer Kooyer could see that she was upset.  He could also see the marks on her wrists and ring marks on her ankles.  He did not see bruises on her face or buttocks.  (TT I, 41-42, 47-49.)

Officer Kooyer went to Petitioner apartment but was not able to find him. Kooyer was able to contact Petitioner by telephone. Petitioner admitted that there had been an arrangement for prostitution with Ms. Buzzitta for several months. He indicated that today's incident maybe ran contrary to past ways of doing it, and that she was angry about the amount of money that would exchange hands. (TT I, 39.) Officer Kooyer asked Petitioner to come in and speak with a detective at 1:00 p.m. the next day. (TT I, 41.)

Detective Adams interviewed Ms. Buzzitta on the morning of August 14, 2008. Detective Adams saw bruises on Ms. Buzzitta's legs, wrists, and ankles, but did not see bruises on her face. (TT II, 118.)

Detective Adams interviewed Petitioner later on August 14, 2008. Petitioner indicated that he had an arrangement with Ms. Buzzitta in the past, paying for sex and that she would allow him to tie her up and assault her. Petitioner indicated that his theory why she had filed a report on this occasion was that she was upset over a discrepancy in the amount or the kind of payment for these services. (TT II, 109, 128.) On cross-examination Petitioner's attorney was able to elicit testimony from Detective Adams that Petitioner showed him his phone. Adams's investigation indicated that Mr. Cobb had placed the calls to Petitioner between 3 and 4 p.m. on the afternoon of August 13, 2008, using Ms. Buzzitta's phone. There had been a phone call from Ms. Buzzitta's phone at 3:41 p.m. that went to voice mail and the recording had been 21 seconds long. (TT II, 129-30.) Detective Adams testified that the actual voice mail message was not available for review. (TT II, 129.) Petitioner just showed him the phone and did not offer to play messages. He did not mention any voice mail messages demanding payment. (TT III, 49.)

Detective Adams testified that police obtained warrants to search Petitioner's residence and executed the warrants on September 9, 2008. Police found no occupant at the apartment and a for

-7-

rent sign was posted. They contacted the apartment's owner to let them inside. The apartment was owned by Petitioner's brother. They arrived together and Petitioner was taken into custody. Police seized a roll of duct tape and a computer. (TT II, 113-14.) Detective Gerald McCarthy testified that he was a certified computer forensic examiner. Exhibits 13-19 admitted at trial were photographs of bondage taken from Petitioner's computer. (TT III, 19-20.)

Sue Rexford testified regarding Petitioner's actions against her on September 11, 1990. Petitioner bound her, taped her mouth with duct tape, hit her buttocks and the backs of her thighs with a riding crop, hit her in the face, raped her, and put a gun to her head and threatened to shoot her. (TT II, 92-100.) Charles Brown, a retired detective, gave very brief testimony regarding the 1990 incident. (TT II, 101-05.)

Petitioner's attorney moved for a directed verdict on both charges. (TT III, 52-55.) With regard to the unlawful imprisonment charge, he argued that the time frame described by Ms. Buzzitta did not "add up." (TT III, 54.) Judge Leiber denied the motion for a directed verdict finding that the evidence that had presented was sufficient for a jury to find Petitioner guilty of both first-degree criminal sexual conduct and unlawful imprisonment. (TT III, 55-58.)

The attorneys delivered their closing arguments. (TT III, 59-96.) Petitioner's attorney argued that the time frame supplied by Ms Buzzitta did not add up and that the victim gave inconsistent versions of the sequence of events. It was not disputed that Petitioner had a fetish for bondage. Ms. Buzzitta was a prostitute and she had agreed to agreed to be tied up and to have sex with Petitioner. Defense counsel argued that Ms. Buzzitta's testimony suggested that they had an agreement, but they were vague on some terms. In addition, he argued that the police had not investigated this incident like a crime. He argued that the prosecution attempted to bolster a weak

-8-

case by introducing the evidence that Petitioner had bondage photographs on his computer and an incident that had occurred between Petitioner and his former girlfriend some 20 years earlier.  (TT III,  80-91.)

The jury returned a verdict finding Petitioner guilty of unlawful imprisonment and CSC I.[2]  (TT III (part 2) at 8, ECF No. 25.)

On July 16, 2009, Judge Leiber sentenced Petitioner as an habitual offender, fourth felony offense, to concurrent prison terms of 30 to 40 years' imprisonment on his CSC-I conviction and 15 to 30 years' imprisonment for unlawful imprisonment.  (J. of Sentence, ECF No. 17.)

Petitioner filed a direct appeal to the Michigan Court of Appeals.  The brief filed by appellate counsel raised the first two issues that Petitioner now presents in his habeas corpus petition.[3]  (Def.-Appellant's Br. at v, ECF No. 26.)  In an unpublished opinion issued on December 2, 2010, the Michigan Court of Appeals affirmed Petitioner's convictions.  (12/2/10 MCOA Op., ECF No. 26.)

---

[2]In 2009, Petitioner had other significant  criminal charges pending against him in Kent County Circuit Court. He was charged with "five felony counts: (1) producing child sexually abusive materials, MICH. COMP. LAWS § 750.145c(2); (2) using a computer to commit a felony with maximum imprisonment of 20 years to life, Mich. Comp. Laws § 752.797(3)(f); (3) possessing child sexually abusive material, MICH. COMP. LAWS § 750.145c(4); (4) using a computer to commit a felony with maximum imprisonment of four to ten years, MICH. COMP. LAWS § 732.797(3)(d); and (5) being a fourth felony offender, MICH. COMP. LAWS § 769.12." See Miller v. Prelesnik, No. 1:12-cv-370, 2012 WL 1577066, at * 1 (W.D. Mich. May 3, 2012).  On May 7, 2009, Attorney Jeffrey Kortes had been appointed to represent Petitioner in that case.  (Case No. 09-05441-FH.)  After the jury had found Petitioner guilty in this case, but before sentencing had occurred, Petitioner filed a grievance against Attorney Kortes.  Kortes then filed a motion to withdraw as Petitioner's attorney in Case No. 09-05441-FH.  Attorney Kortes noted that there was adequate time for new counsel to prepare because no trial date had yet been set in Case No. 09-05441-FH Judge Leiber granted the attorney's motion to withdraw and appointed new counsel.  (Pet'r's Mot. for Relief from J., Exhibit W, 8/14/09 Hr'g Tr. , Case No. 09-05441-FH.)  "On August 23, 2010, Petitioner pleaded guilty to count four in exchange for dismissal of the other counts.  Petitioner's attempts to overturn his plea-based conviction proved unsuccessful and Judge Janet Neff of this Court denied his habeas corpus petition.  2012 WL 1577066, at * 1-9.

[3]Petitioner's appellate counsel also presented an argument regarding Petitioner's minimum sentence on the CSC-I conviction that the Court of Appeals found to be persuasive.  It resulted in the reduction of Petitioner's minimum sentence down to "26 years, eight months."  (Op. at 5; 12/3/10 Am. J. of Sentence.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court, raising the issues rejected by the Michigan Court of Appeals. (Def.-Appellant's Appl. for Leave to Appeal at iv, ECF No. 27.)  On June 28, 2011, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed by the court. (6/28/11 Mich. Order, ECF No. 27.)

Petitioner filed a motion for post-conviction relief in the trial court.  He repeated the two grounds presented and rejected on direct appeal.  He added the following two issues:

I.    THE SEARCH WARRANT HAS THE WRONG ADDRESS AND THE WRONG DESCRIPTION OF THE RESIDENCE AND EVIDENCE TAKEN OUTSIDE THE SCOPE OF THE WARRANT. [PETITIONER] IS ENTITLED TO A NEW TRIAL.

II.   INEFFECTIVE ASSISTANCE OF COUNSEL[.]   [PETITIONER'S] COUNSEL FAILED TO R[A]ISE EVIDENCE AND KEY DOCUMENTS THAT WOULD HAVE CHANGED THE OUTCOME OF THE TRIAL. [PETITIONER] IS ENTITLED TO A NEW TRIAL.

(Mot. for Relief from J., ECF No. 30.)  On August 24, 2011, the trial court entered an opinion and order denying Petitioner's motion.  (8/24/11 Cir. Ct. Op. & Order, ECF No. 31.)

Petitioner sought leave to appeal to both the Michigan Court of Appeals and the Michigan Supreme Court.  On November 22, 2011, the court of appeals denied Petitioner's delayed application for leave to appeal "for failure to meet the burden of establishing entitlement to relief under MCR 6.508(D.)" (11/22/11 MCOA Order, ECF No. 28)  The Michigan Supreme Court denied Petitioner's application for leave to appeal on July 24, 2012, because it was not persuaded that question presented should be reviewed by the court.  (7/24/12 Mich. Order, ECF No. 29.)

Petitioner filed his petition for federal habeas corpus relief on August 31, 2012. (Pet., ECF No. 1.)

-10-

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have

appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo*

review.  *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## **Discussion**

I.    Ground I:  Self-Representation

In Ground I of his petition, Petitioner argues that the trial court violated his right to self-representation by denying his motion to represent himself without holding a hearing as required by *People v. Anderson*, 247 N.W.2d 857 (Mich. 1976).  (Pet. 3-5, ECF No. 1, PageID.3-5; Pet'r's Br. at iv, ECF No. 1, PageID.11.)

The Sixth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, provides that a criminal defendant shall have the right to the assistance of counsel in his defense.  *See* U.S. Const. amend. VI; *see also Faretta v. California*, 422 U.S. 806,

832-34 (1975); *Martinez v. Ct. of Appeal of Cal.*, 528 U.S. 152, 154 (2000). This right necessarily implies its corollary, that a defendant has a right to proceed without counsel and represent himself. *Faretta*, 422 U.S. at 832-34; *see also United States v. Mosely*, 810 F.2d 93, 97 (6th Cir. 1987) ("'The right to defend *pro se* and the right to counsel have been aptly described as "two faces of the same coin," in that waiver of one right constitutes a correlative assertion of the other.'") (quoting *United States v. Conder*, 423 F.2d 904, 908 (6th Cir. 1970)). "[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." *Faretta*, 422 U.S. at 817.

Given the importance of the right to counsel, however, a defendant's request for self-representation must be unequivocal and his waiver of his right to counsel and the decision to proceed *pro se* must be knowing, voluntary and intelligent. *See Faretta*, 422 U.S. at 834-35; *Johnson v. Zerbst,* 304 U.S. 458, 464-65 (1938). For any such waiver to be effective, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" *Faretta*, 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). Whether a defendant's choice was made with "eyes open" generally "depend[s], in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." *Zerbst,* 304 U.S. at 464-65. The Supreme Court has "not prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," *Iowa v. Tovar*, 541 U.S. 77, 88 (2004), and there is "no sacrosanct litany for warning defendants against waiving the

right to counsel."[4]  *United States v. Jones*, 421 F.3d 359, 363 (5th Cir. 2005).  However, less rigorous warnings are required before trial than at trial "because, at that stage, 'the full dangers and disadvantages of self-representation . . . are less substantial and more obvious to an accused than they are at trial.'"  *Tovar*, 541 U.S. at 90 (quoting *Patterson v. Illinois*, 487 U.S. 285, 299 (1988)).

In addition, the Supreme Court has recognized that the right to self-representation "'is not absolute.'"  *Indiana v. Edwards*, 554 U.S. 164, 171 (2008) (holding that in the context of prior issues of mental competency may permit a state to limit the right of self-representation) (quoting *Martinez*, 528 U.S. at 162).  As the *Faretta* Court itself observed, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom." 422 U.S. at 834 n.46 (internal quotation omitted).  "[T]he government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer.  *Martinez*, 528 U.S. at 162 (holding that the right of self-representation does not apply on direct appeal in a criminal case).  For example, courts may require that a defendant make his request to represent himself in a timely fashion.  *Id.*; *see also Hill v. Curtin*, 792 F.3d 760, 767 (6th Cir. 2015) (en banc) (finding state court's denial of untimely request for self-respresentation to be a reasonable application of clearly established Supreme Court precedent).  In addition, a court may appoint standby counsel even without the express consent of the defendant.  *Id.*  Nevertheless, a court is not required to appoint standby counsel or permit "hybrid" representation. *McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984).  Further,

---

[4]The Court notes that the Sixth Circuit requires federal district courts within the circuit to conduct an inquiry as set forth in *1 Bench Book for United States District Judges* 1:02-2 (3d ed. 1986) before accepting a waiver of a right to an attorney.  *King v. Bobby*, 433 F.3d 483, 492 (6th Cir. 2006); *United States v. McDowell*, 814 F.2d 245, 250 (6th Cir. 1987).  However, this type of formal, detailed inquiry is not required by clear Supreme Court precedent.  *King*, 433 F.3d at 492. Accordingly, in the context of federal habeas review, there is no script that a state court must follow in determining whether a criminal defendant has made a "knowing, voluntary, and intelligent" waiver of counsel.  *Id.* Rather, the state court must reasonably apply Supreme Court precedent, which requires looking at the "whole record" to determine if the defendant made a knowing and intelligent waiver.  *Id.*

the trial judge need not provide personal instruction on procedure or otherwise assist the defendant. *Id.* (citing *McKaskle*, 465 U.S. at 183-84).   Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. *Faretta*, 422 U.S. at 834 n.46 (citing *Illinois v. Allen*, 397 U.S. 337, 342 (1970) (holding that a defendant's right to confront witnesses may be overcome by the defendant's engagement in disruptive conduct)).

Finally, "[s]ince the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis.   The right is either respected or denied; its deprivation cannot be harmless." *McKaskle*, 465 U.S. at 177 n.8; *see also Washington v. Renico*, 455 F.3d 722, 734 (6th Cir. 2006) (holding that "denial of the *Faretta* right is a structural error for which [defendant] need not show any prejudice") (citing *McKaskle*, 465 U.S. at 177 n.8).

Here, the Michigan Court of Appeals held that Petitioner never made an unequivocal request for self-representation:

A criminal defendant has a right to represent himself, US Const, Am VI; const 1963, art 1, § 13; MCL 763.1; *People v Kevorkian*, 248 Mich App 373, 417; 639 NW2d 291 (2001), although there is a presumption against the waiver of counsel. *People v Belanger*, 227 Mich App 637, 641; 576 NW2d 703 (1998). A defendant seeking to proceed in propria persona must make an unequivocal request for self-representation. *[People v] Russell*, 471 Mich. [182,] 190, 684 N.W.2d 745 [(Mich. 2004)]; *[People v] Williams*, 470 Mich. 634, 642, 683 N.W.2d 597 [(Mich. 2004)]. The purpose of this requirement is to "abort frivolous appeals by defendants who wish to upset adverse verdicts after trials at which they had been represented by counsel." *People v. Anderson*, 398 Mich. 361, 367, 247 N.W.2d 857 (1976). Once a defendant makes an unequivocal request to represent himself, the trial court must determine that the defendant's assertion of his right to self-representation is knowing, intelligent, and voluntary by informing the defendant of the potential risks. *Williams*, 470 Mich. at 642, 683 N.W.2d 597; see also MCR 6.005(D)(1). The trial court is to

-16-

make every reasonable presumption against the waiver of the right to counsel. *Russell*, 471 Mich. at 188, 193, 684 N.W.2d 745.

In this case, on June 9, 2009, defendant filed a handwritten "Motion for Defendant to Represent Himself in these Matters." Defendant's motion was based on his allegation that "defense counsel failed at every stage[;] since January 5, 2009 the Defendant has been requesting discovery and Defendant's counsel has failed to respond, which has denied him due process and a fair trial." Defendant also alleged that "Defendant's Counsel has failed to turn in a witness list for Defendant and he has failed to respond to the key documents needed to present this matter before this Honorable Court." Defendant concluded by requesting that the court grant the motion "to represent himself in these matters." In the brief in support of the motion, defendant again refers to counsel's failure to request discovery, as well as counsel's failure to file an appeal with regard to the trial court's denial of his motion to dismiss. Defendant again requested that he be allowed to represent himself "in both matters before this Honorable Court." On June 10, 2009, the trial court issued a written order denying the motion on the ground that "the right to self-representation and the right to counsel are mutually exclusive."

Defendant's request to represent himself "in both matters," when read in the context of his motion and his brief, suggests that defendant was requesting to represent himself with regard to his request for discovery, as well as the motion for leave to appeal of the denial of his motion to dismiss. Nowhere in the context of the motion is there a request to represent himself at trial. Defendant's motion was not an unequivocal request to represent for self-representation.

(12/2/10 MCOA Op. at 2, ECF No. 1-1, PageID.148.) Although the court of appeals relied upon Michigan cases in reaching its decision, those cases specifically rely upon federal law. *See Russell*, 684 N.W.2d at 187-92 (discussing *Faretta*, 422 U.S. 806, and holding that *Anderson*, 247 N.W.2d 857, incorporated the *Faretta* standard into Michigan law).

The court of appeals' decision was both legally and factually reasonable. Petitioner's motion and brief did not constitute an unequivocal request to represent himself in the trial proceedings. Instead, Petitioner's motion contained limiting language, seeking only to represent himself with respect to two matters that Petitioner was attempting to bring before the court pro se. The motion referenced Petitioner's request for discovery materials. In addition, the motion was filed

in conjunction with a pro se motion to appeal the court's denial of his motion to dismiss on the basis of a speedy trial violation.  The court of appeals found that Petitioner sought only to represent himself on the specific issues raised in the motion.  That conclusion constituted an entirely reasonable determination of the facts, *see* 28 U.S.C. § 2254(d)(2), and it is entitled to a presumption of correctness, which Petitioner has the burden of rebutting by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Sumner*, 449 U.S. at 546; *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656.

Petitioner utterly fails to meet that burden.  Instead, he argues that the court erred in not conducting an inquiry into whether Plaintiff's decision to waive his right to counsel was knowing, intelligent and voluntary.  However, as the Sixth Circuit and most other circuits have concluded, "*Faretta* [procedures] are only required when a defendant has clearly and unequivocally asserted his right to proceed *pro se*."  *In re Cromer*, 389 F.3d 662, 680-81 (6th Cir. 2004) (citing cases).  Because the state court reasonably concluded that Petitioner's request to represent himself was not unequivocal, it did not need to conduct a hearing on the voluntariness of his decision.  *Id.*

As a consequence, the decision of the Michigan Court of Appeals denying Petitioner's first habeas ground was neither based on an unreasonable determination of the facts nor resulted in an unreasonable application of established Supreme Court precedent.

II.    Rule 404(b) of the Michigan Rules of Evidence

In Ground II, Petitioner argues that the trial court abused its discretion by allowing Mich. Rules of Evidence 404(b) other acts evidence into the record.  (Petition at 3-5, ECF No. 1, PageID.3-5; Petitioner's Brief at iv, ECF No. 1, PageID.11.)

To the extent that Petitioner argues that the admission of other acts evidence violated Michigan law, his claim is not cognizable in this proceeding.  The extraordinary remedy of habeas

corpus lies only for a person held in custody in violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68 (citations and quotations omitted).  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68; *accord Swarthout v. Cooke*, 562 U.S. 216, 219-21 (2011).

Moreover, to the extent that the Michigan Court of Appeals found the admission proper under the Michigan Rules of Evidence (*see* MCOA Op. at 3-4, PageID.149-150), that determination is conclusive.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)).

With respect to Petitioner's claim that admission of other acts evidence violates due process, Petitioner cannot demonstrate entitlement to relief.  There exists no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process.  *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.

While the Supreme Court has addressed whether prior acts testimony is admissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms. The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh*, 329 F.3d at 512. The decision of the Michigan Court of Appeals rejecting Petitioner's claim therefore was not "contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

III.   Fourth Amendment:  Defective Search Warrant

In his third ground for habeas relief, Petitioner argues that search warrant had the wrong address and the wrong description of the residence. He further argues that the search warrant was issued on the basis of false allegations. (*See* Pet. at 4-5, ECF No. 1, PageID.4-5; Pet'r's Br. at iv, 10-13, ECF No. 1, PageID.11-13, 22-25.)

Habeas corpus review of Petitioner's Fourth Amendment claim is barred by the doctrine of *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone v. Powell*, the Supreme Court held that federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure, as long as the state has given the Petitioner a full and fair opportunity to litigate the Fourth Amendment claim. *Id.* at 481-82. In order for the rule of *Stone v. Powell* to apply, the state must have provided, in the abstract, a mechanism by which to raise the Fourth Amendment claim, and the presentation of the claim in the case before the court

-20-

must not have been frustrated by failure of that mechanism. *See Gilbert v. Parke*, 763 F.2d 821, 823 (6th Cir. 1985). If these two inquiries are satisfied, federal habeas review of the Fourth Amendment claim is precluded, even if the federal court deems the state-court determination of the claim to have been in error. *Id.* at 824; *accord Jennings v. Rees*, 800 F.2d 72, 76 (6th Cir. 1986); *Markham v. Smith*, 10 F. App'x 323, 326-27 (6th Cir. 2001).

In the present case, Petitioner does not satisfy either prong of the *Stone v. Powell* standard. First, it is beyond dispute that Michigan has a state procedural mechanism that presents a defendant a full opportunity to raise a Fourth Amendment claim before trial. Even before the United States Supreme Court decided that the federal exclusionary rule applied to state criminal proceedings, the Michigan courts applied the exclusionary rule to the fruits of unconstitutional searches and seizures. *See People v. Margelis*, 186 N.W. 488 (Mich. 1922). After *Mapp v. Ohio*, 367 U.S. 643 (1961), the Michigan courts consistently have acknowledged their duty, under both the federal and state constitutions, to suppress evidence seized in violation of the Fourth Amendment. *See, e.g.*, *People v. David*, 326 N.W.2d 485 (Mich. Ct. App. 1982). Consequently, Michigan affords criminal defendants a vehicle by which to raise Fourth Amendment challenges. *See Good v. Berghuis*, 729 F.3d 636, 639-40 (6th Cir. 2013); *Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012).

Second, Petitioner has never alleged, either in his petition or in his state court appeals, that the state procedural mechanism failed. Moreover, although Petitioner raises a claim of ineffective assistance of trial and appellate counsel, he does not claim that counsel was ineffective in either failing to challenge the search warrant or failing to raise the claim on appeal. Instead, Petitioner's third habeas argument is strictly directed to describing the alleged errors in the warrant, a question that this Court may not reach unless state procedure prevented him from raising the claim

-21-

in the state courts.  Because Petitioner has failed to demonstrate either prong of the *Stone v. Powell*

standard his claim of illegal search and seizure is barred on habeas review.

IV.    <u>Ineffective Assistance of Trial and Appellate Counsel</u>

In Ground IV of his habeas application, Petitioner broadly claims that both his trial

counsel and his appellate counsel rendered ineffective assistance of counsel.  With respect to trial

counsel, Petitioner contends that his attorney failed to diligently gather evidence and documents and

permitted false allegations and motions to go unchallenged, specifically the following:

1.    Cell phone where is it?
2.    Cell phone messages?
3.    Trip to d[ir]t road for time?
4.    Det. Adams reports & affidavits?
5.    Times don't add up?
6.    Injuries reported 24 hours after incident?
7.    Computer expert for defendant?
8.    Sexual assault expert for the defendant?

(Br. in Supp. of Pet., ECF No.1, PageID.27.)  In addition, Petitioner argues that appellate counsel

"failed to raise such blistering evidence on appeal and this evidence is such that it would have

changed the outcome of the trial and appeals."  (Br. in Supp. of Pet., ECF No. 1, PageID.26.)

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court

established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To

establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's

performance fell below an objective standard of reasonableness; and (2) that counsel's deficient

performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.

A court considering a claim of ineffective assistance must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The

defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

After listing the alleged errors by counsel, Petitioner spends little time fleshing out his basis for believing that defense counsel failed to make the appropriate investigations and what additional information the proposed investigations could have shown that were not part of the trial. With respect to Petitioner's claims about the inconsistencies in the timing of events, defense counsel fully highlighted such inconsistencies. Defense counsel repeatedly challenged the victim's and Mr.

-23-

Cobb's descriptions of the incident, highlighting the problems with the timing as described by the witnesses and the differences between the statements made to police and at trial. (TT II, 67-71, 73-78; TT III, 39-40.) Defense counsel also highlighted the impossibility that the victim left her house at 9:30 or 10:00 a.m., spent two hours being assaulted at Petitioner's house, traveled 45 minutes each way to Clarksville, and yet was able to make the 911 call at 11:44 a.m. (TT II, 67, 78-80; TT III, 38, 42-45.) The difficulties of reconciling the timing were at the center of defense counsel's motion to dismiss (TT III, 53-54) and his closing argument (TT III, 82-83.) Because defense counsel clearly understood and utilized the problems with the timing of the recited events, counsel clearly did not ignore the discrepancies in timing and was not ineffective in his handling of those issues.

Similarly, Petitioner's claim that counsel failed to make use of the fact that certain injuries were not reported until 24 hours later is unsupported by the record. Defense counsel repeatedly cross-examined Officer Kooyer, the victim, and Mr. Cobb about the discrepancies between the injuries reported and photographed the first day and the injuries photographed the second day. (TT II, 45-46, 81-82; TT III, 42-43.) Counsel also emphasized in closing argument that the stories about injuries and the nature of the sexual acts had changed between the first police interview and trial. (TT III, 81, 85, 88-89, 91.)

Moreover, it is readily apparent from the record that counsel had Detective Adams' reports, as he referenced them in his cross-examination of Detective Adams. (*See* TT III, 116-18.) In addition, despite Petitioner's argument about defense counsel's failure to produce his cell phone and cell phone records, it is apparent that counsel was using Detective Adams' failure to investigate and failure to listen to the phone calls, in order to cast doubt on Cobb's claim that he called to yell at Petitioner for hurting Ms. Bazzitta. Petitioner told Adams that Cobb and the victim had called him

-24-

after the incident to demand money, in order to persuade Adams that the victim's allegations were false. Petitioner also told police that Cobb called to complain that they had not been paid for the sex. (TT II 120-21, 126-28; TT III, 47-49.) Despite having the phone calls brought to his attention, Detective Adams did not listen to the voice mail. Counsel clearly wished to use inference to suggest that the police failed to adequately investigate, a theme throughout trial. Petitioner provides no evidence that use of the actual recording would have supported his version of the message. As a consequence, Petitioner fails to demonstrate that the recording was available and that it would have supported Petitioner's version of events. He therefore has not overcome the presumption that counsel's decision not to use the message was strategic. *Strickland*, 466 U.S. at 689.

Finally, Petitioner argues that defense counsel should have retained a computer expert and an expert on sexual assault. He utterly fails, however, to indicate what possible evidence such experts could have provided that would have supported Petitioner's defense. No sexual assault exam was conducted, and the nurse examiner who testified for the prosecution limited her testimony to discussing the nature of the bruising on the victim's thighs. Similarly, the prosecution's computer expert merely discussed the nature of the images on Petitioner's computer. Defense counsel reasonably elected to vigorously cross-examine these witnesses. Petitioner does not even argue, much less show, how a defense expert's testimony would have differed on these points. Petitioner therefore has failed to overcome the presumption that defense counsel performance was reasonable.

Turning to Petitioner's claim of ineffective assistance of appellate counsel, Petitioner also fails to demonstrate entitlement to relief. An appellant has no constitutional right to have every non-frivolous issue raised on appeal. "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of

effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *Strickland*, 466 U.S. at 688.  As the Supreme Court recently has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another.  *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present."  *Id.*

Petitioner fails even to identify which issues appellate counsel should have raised. Instead, he simply argues that, had appellate counsel pointed out the factual discrepancies, the court of appeals would have granted him relief.  Such an argument is patently weaker than the two arguments presented by appellate counsel on appeal.  Appellate counsel focused on legal errors:  the constitutionality of the court's denial of Petitioner's request to represent himself and the propriety of admitting the evidence of other bad acts.  Petitioner, instead, would have had counsel argue the facts.  However, factual determinations are for the trier of fact and are reviewed only for clear error on appeal.  *See, e.g., People v. Miller*, 759 N.W.2d 850, 854 (Mich. 2008) (citing *People v. Cress*, 664 N.W.2d 174, 192 (Mich. 2003).  Despite Petitioner's dissatisfaction with the jury's view of the evidence, any challenge to the jury's interpretation of the evidence would have failed the clear-error standard.  As a consequence, Petitioner fails to demonstrate that appellate counsel acted unreasonably in deciding to raise the two issues he did.

For similar reasons, Petitioner cannot demonstrate that appellate counsel's alleged error resulted in prejudice. To determine prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Counsel's failure to raise an issue on appeal is ineffective assistance "only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005). Because a challenge to the jury's factual determinations would have been frivolous, the failure to raise the issue could not have changed the outcome of the appeal.

Having reviewed all of the alleged incidences of ineffective assistance of counsel, the Court concludes that the state courts' decisions to deny the claim were neither contrary to nor an unreasonable application of established Supreme Court precedent.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned

assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

   The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

   A Judgment and Order consistent with this Opinion will be entered.


Dated: <u>November 16, 2016</u>    <u>/s/ Robert Holmes Bell</u>
            ROBERT HOLMES BELL
            UNITED STATES DISTRICT JUDGE